**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| SALVATORE FRISELLA, | § | |
| PAUL PATRICK DAY, and | § | |
| HOWARD JEFFREY HUGHES | § | |
| | § | |
| *Plaintiffs* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:24-cv-469-D |
| | § | |
| DALLAS COLLEGE, | § | |
| | § | |
| *Defendant.* | § | |

## PLAINTIFFS' SECOND AMENDED COMPLAINT

NOW COME Salvatore Frisella, Paul Patrick Day, and Howard Jeffrey Hughes, Plaintiffs in the above-styled and numbered cause, and file this Second Amended Complaint against Defendant Dallas College, as permitted by the Court's Memorandum Opinion and Order dated October 8, 2024 [Doc. 24]. Plaintiffs would respectfully show the Court the following:

## I. THE PARTIES

1.1    Plaintiff Salvatore "Sal" Frisella is an individual residing in Denton County, Texas.

1.2    Plaintiff Paul Patrick Day is an individual residing in Rockwall County, Texas.

1.3    Plaintiff Howard "Jeff" Hughes is an individual residing in Dallas County, Texas.

1.4    Defendant Dallas College is a college or college district organized under the laws of the State of Texas for the purpose of operating a community college at several campuses in and around Dallas County, Texas. Also, Defendant is a "state actor" within the meaning of applicable law and the actions complained of herein comprise "state action." Defendant has been served or has waived service, and has appeared in this action through counsel.

## II.  VENUE AND JURISDICTION, INCLUDING STANDING

2.1     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), as all or part of Plaintiffs' claims accrued in Dallas County, Texas, which is within this district and division.

2.2      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1377; the provisions of 42 U.S.C. §§ 1983 and 1988; Article III, § 2 of the United States Constitution ("Article III"), and the 1st and 14th Amendments to the United States Constitution.

2.3     Plaintiffs affirmatively assert that they plausibly allege standing under Article III in this Second Amended Complaint, in the Factual Background and Causes of Action sections below. Such sections have been amended since Plaintiffs' First Amended Complaint. These factual allegations, taken as true, as they must be at this stage, demonstrate that Plaintiffs "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the Defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

### A.     Injury in Fact

2.4     Although Plaintiffs' employment with Dallas College has "continued" so far, their right to "continuing employment" has been severely diminished, as alleged below.[1] They specifically allege, and here argue, that they have been deprived of a property interest by Dallas College's removal of their tenured status, and the protections they previously enjoyed under the policies governing their employment. To show that the rights they have lost form a property interest, and that deprivation of such rights is an injury in fact, we first turn to statutory analogues.

---

[1] The professors in *Collins v. Wolfson* did not allege a deprivation of property interest, but instead complained that their employer deprived them of their liberty interest in their good name. 498 F.2d 1100, 1101-1102 (5th Cir. 1974). While they may not have suffered an injury in fact due to their lack of job loss, their case in not applicable to ours.

In both *Spokeo* and *TransUnion LLC v. Ramirez*, the Supreme Court discussed rights created under federal statutes and warned that while Congress's views may be "instructive," its "role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right. Article III standing requires a concrete injury even in the context of a statutory violation." *Spokeo,* 578 U.S. at 341; *see also TransUnion LLC v. Ramirez*, 594 U.S. 413, 425-426 (2021).

2.5    Thus, for example, an injury supporting a claim under Title VII might not automatically give rise to a concrete injury for purposes of Article III standing, but must instead meet the same test that Plaintiffs must meet here – of injury in fact – to maintain a lawsuit in federal court. It follows that if the Supreme Court recognizes a Title VII injury, as in *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024), such an injury meets the test for Article III standing. In *Muldrow*, although the plaintiff police officer was transferred against her wishes, she not only retained her employment, she had no change in pay or rank.  601 U.S. at 351. She did, however, go from plain clothes to uniform; lost perks and a traditional Monday-through-Friday shift; lost her FBI status and the car that came with it; and found herself supervising neighborhood patrol officers instead of working on the Intelligence Division's departmental priorities. *Id.* The Supreme Court held that under Title VII, a discriminatory change in terms or conditions of employment is actionable if there is any way it disadvantages the Plaintiff. The Sixth Circuit had upheld a summary judgment in favor of the City of St. Louis, holding that the officer had to show that her discriminatory transfer caused a "materially significant disadvantage." The Supreme Court could not find any such test in the wording of Title VII. *Id.* at 359.

2.6    The Fifth Circuit reached a similar conclusion the year before, in *Hamilton v. Dallas County*, 79 F.4th 494 (5th Cir. 2023). Sitting *en banc*, the Court reversed course on the judicially created standard of "ultimate employment decision" which had been Fifth Circuit law for a generation. *Id.* at 499-501. The Court recognized that plaintiffs are not required to allege an ultimate employment decision, but may bring claims for discrimination "with respect to the terms, conditions, or privileges of employment," not limited to economic or tangible discrimination. *Id.* at 503, *citing Faragher v. City of Boca Raton,* 524 U.S. 775, 786 (1998); *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993)*; and Oncale v. Sundowner Offshore Servs.,* 523 U.S. 75,78 (1998)*.* They certainly do not have to show that they have lost their jobs to show that they have lost conditions or privileges of employment.

2.7    As explained in *TransUnion* and *Spokeo*, the Title VII claims in *Hamilton* and *Muldrow* do not have a different test for Article III standing simply because of their statutory basis. Plaintiff Frisella, Day, and Hughes have alleged concrete harms, no less than the transferred officer in *Muldrow*. Much as she found herself in a very different job after her transfer, the Plaintiffs have very different jobs after the Dallas College policy changes, despite retaining their employment and salaries. They no longer have any assurance of long-term employment. Their protections, described in detail below, which were part of the policies, rules, and understandings at Dallas College are gone. They have lost their tenure, which is itself is a valuable property interest. Denial of tenure, for example, is actionable because the difference between tenured employment and term employment is undeniable.

2.8    The denial of tenure for discriminatory reasons can support a judgment requiring reinstatement with tenure. *Brown v. Trs. of Bos. Univ.*, 891 F.2d 337, 359-361(1st Cir. 1989) ("The jury found that, 'but for' sex discrimination, Brown would immediately have been granted tenure.

Awarding her tenure is the only way to provide her the most complete relief possible.") In the Southern District of Texas, the status of tenure has been recognized as a property interest itself. *Curtis v. Univ. of Hous.* 940 F.Supp. 1070, 1071 (S.D. Tex. 1996), citing *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972). ("Although Curtis has *a property interest in his status as a tenured associate professor,* he has no property right to the promotion." (emphasis added))

2.9     Along the same lines, the Fifth Circuit observed that under *Roth,* "a tenured city employee" has "a constitutionally protected property interest *in her position.*" *Rathjen v Litchfield* 878 F2d 836, 838 (5th Cir. 1989) (emphasis added). In *Winkler v. Cty of De Kalb*, the Fifth Circuit acknowledged that the public employer could not simply change or disregard "rules or mutually explicit understandings,"[2] agreeing with the Second Circuit that:

> although this primary source of property rights is state law, the state may not magically declare an interest to be "non property" after the fact for Fourteenth Amendment purposes if, for example, a longstanding pattern of practice has established an individual's entitlement to a particular governmental benefit.

648 F.2d 411, 414 (5th Cir. 1981), *citing Quinn v. Syracuse Model Neighborhood Corporation*, 613 F.2d 438, 448 (2d Cir. 1980).

**B.     What's it to you?[3]**

2.10     An academic seeking employment and deciding between a job offer as a lecturer under a term contract and a job offer as a tenured – or even tenure-track – professor, is not looking at equivalent jobs. One establishes a set term during which the lecturer has contract rights. The other envisions a settled career, academic freedom, freedom from fear of termination without good cause and due process, freedom from having to find a new position at the end of a contract term; even an offer of a tenure-track position holds the possibility of achieving tenure.

---

[2] Citing *Perry v. Sindermann*, 408 U.S. 593, 601, (1972).

[3] *TransUnion*, 594 U.S. at 423.

2.11    A professor calling their spouse to say, "Honey, I have a contract under which I cannot be terminated without cause for two whole years!" is not giving the same news as a professor calling to say "Honey, I have tenure!"

2.12    For many years, each of the Plaintiffs had employment with Dallas College which they knew would continue absent their employer proving good cause to terminate them. That form of employment was abruptly taken away, with no due process. That is a demotion, under any definition, and a staggeringly significant change to the terms of their employment. They may not yet have lost their jobs, but they have been concretely, particularly, and actually affected by their employer unilaterally removing their vested right in their employment. "What's it to [them]?" That is what it is to them.

2.13    For each of their claims set forth in Section IV, and for each form of relief they seek, Plaintiffs adequately allege standing, including injury in fact, as follows.

### III.  FACTUAL BACKGROUND

A.    **The Property Interests**

3.1    This case is brought by three professors employed by Dallas College. Each Plaintiff was employed for many years under written contracts and consistent with Dallas College's former version of policy DCA(LOCAL).  Plaintiffs (and others) were still employed under the former version of DCA(LOCAL) at the time the Dallas College Board of Trustees (the "Board") revised DCA(LOCAL) to eliminate the long-standing practice, as implemented by the Defendant's actual practices and policies since approximately 1970, in which proven faculty were afforded a new three-year contract each year (hereafter referred to as the "rolling 3-year contract"). Under Texas Law, the policies and practices of the College automatically became part of a full-time faculty member's contract because both parties were expected to comply with those policies.

3.2     The Defendant College District unlawfully attempted to diminish or eliminate long-standing policies and practices by having its Board purport to revise at least five written policies, including DMAB(LOCAL) on or about February 2022, DMAA(LOCAL) on or about August 2023, and DCA(LOCAL), DLA(LOCAL), and DD(LOCAL) on or about July 2023.

3.3     For many years, the annually, automatically renewable rolling 3-year contract was a form of tenure at Dallas College. Defendant has revoked such tenure. Defendant has altered its policies to deprive Plaintiffs of the property rights they previously enjoyed in continued, protected employment. Plaintiffs brought this lawsuit while still under the rolling 3-year contracts issued for Fall 2021-Spring 2024. Although such contracts have now expired, each Plaintiff had, at the time this lawsuit was filed, been deprived of their property rights in the previous policies, and in their employment status as tenured employees; or, in the alternative, arguably were still tenured despite Defendant's ineffective efforts to change their status, for at least the following reasons:

1     Each Plaintiff was in a rolling 3-year contract, renewable automatically each year. Each Plaintiff had a property interest in such rolling 3-year contract. Defendant has purportedly terminated that 3-year contract, or materially diminished it, without offering any due process to the Plaintiffs.  The diminution of Plaintiffs' rights under their rolling 3-year contract deprived each of them in their property interest in their status, including depriving them of tenure.

2     The Defendant's long-standing policy and practice had become part of the Plaintiffs' contracts because both parties were expected to comply with such policies. Each Plaintiff thus had a property interest in the overall contract, including both the written document and the policies. Defendant's actions violated and

deprived Plaintiffs of their rights under such contracts and policies when Defendant failed to issue each of them new three year contracts to begin in Fall 2022.

3      During the terms of their contracts, each Plaintiff had the right to continue in his academic position unless dismissed by the District for good cause. On September 1, 2023, the Texas Legislature's new tenure scheme went into effect, including the following definition of tenure:

> "Tenure" means the entitlement of a faculty member of an institution of higher education to continue in the faculty member's academic position unless dismissed by the institution for good cause in accordance with the policies and procedures adopted by the institution under Subsection (c-1).

Tex. Educ. Code § 51.942(a)(4).

This statutory definition of tenure is in harmony with the Defendant's historic policy and practice, and upon its effective date, recognizes each Plaintiff's right of tenure; as applied to Plaintiffs, it would mean, as was Dallas College policy for decades, that Plaintiffs cannot be dismissed without a showing of good cause, after procedural due process has been afforded. Now, under Dallas College's new policies, Plaintiffs' tenure has been unilaterally revoked, and their right to demand a showing of good cause for termination has been taken away. None of the three Plaintiffs have been dismissed by the institution, but their right to the due process protections inherent in their *tenured positions*, as opposed to rights under *term contracts*, has been eliminated by Defendant.

4.     Defendant's tenure policies were still in place, and Plaintiffs were still under three-year contracts signed under the previous policies, when Defendant's Board attempted to change Plaintiffs' rights under such contracts without any due process

or hearing. Plaintiffs were still within those 2021-2024 three-year contracts, retaining all contractual rights thereunder, at the time this lawsuit was filed; by virtue of the new statue, the new definition still provides for no dismissal or "nonrenewal" without due process, just as Defendant's policies provided for many years. Therefore, in the alternative, Plaintiffs ask this Court to confirm that the new definition is superimposed on Plaintiffs' existing contracts, and Defendant cannot purport to "nonrenew" without due process.

3.4    From the early 1970s until 2022, full-time faculty at Dallas College[4] had a form of tenure under which three-year employment contracts were not only renewed, but replaced each year with a new three-year contract, and faculty under such contracts were only subject to termination for good cause, and with appropriate due process. That is, the policy as it existed matches the definition of tenure now codified under Texas law.

3.5    In 2022, Professor Frisella had been under consecutive rolling three-year contracts since the fall semester of 2006 ("Fall 2006")[5]; Professor Day had been under consecutive rolling three-year contracts since Fall 2019; and Professor Hughes had been under consecutive rolling three-year contracts since Fall 2007. The policy, practice, and custom of Dallas College throughout those years conferred on Plaintiffs a property interest in their ongoing employment, with automatic renewal (subject to "effective" performance ratings) each year, along with their salary and benefits.

3.6    Defendant has deprived Plaintiffs of their property interests in their tenured employment, that is, in their status as tenured faculty, which gave them (1) ongoing, automatically

---

[4] Prior to 2020, Dallas College was known as Dallas County Community College District, or DCCCD for short. This Complaint refers to the former DCCCD as Dallas College throughout.

[5] When capitalized herein, "Fall" or "Spring" shall refer to the fall academic semester or spring academic semester, of a given year.

renewed contracts, and (2) vested interests in protection from termination. These rights were themselves, separate and apart from Plaintiffs' employment itself, property interests which have been stripped from Plaintiffs, in violation of the Fourteenth Amendment.

**B.    The Three Plaintiffs**

<u>Professor Sal Frisella</u>

3.7    Professor Frisella began as an adjunct professor at Defendant's Northlake campus in 1994, and at the Eastfield campus in 2002. He was a full-time "Visiting Scholar" from Fall 2002 to Spring 2004, becoming a permanent full-time instructor in Fall 2004. Since 2006, he has served under rolling three-year contracts, and at the time of the filing of this lawsuit, he was in his last semester of his last three-year contract, which began Fall 2021 and ran through Spring 2024. He has been offered only a one-year non-rolling contract for academic year 2024-2025. Dallas College refused to grant him a three-year contract, despite his request for one. Dallas College did not provide him with due process before denying him such contract. Professor Frisella has consistently met or exceeded expectations on his annual performance reviews.

3.8    When Professor Frisella was teaching full-time at Eastfield in 2006, Texas Woman's University offered him a full-time teaching position on a one-year contract. Because of the rolling three-year contracts at Dallas College (then DCCCD), he turned it down. In 2003, Professor Frisella's dean, Mark Presley, told him that the rolling three-year contract was the college's version of tenure. This was reiterated in 2005 by Eastfield Vice President Allatia Harris, who also told Professor Frisella that the rolling three-year contract was the college's version of tenure.

Professor Paul Patrick Day

3.9    Professor Day began as an adjunct professor with Dallas College in 2015, and was hired full-time in 2016. In total, he has taught for thirteen years as a college professor, plus five years as a graduate teaching assistant. He has taught in person at Eastfield and online for multiple campuses, and is now assigned to the Cedar Valley campus. He received his first three-year rolling contract in 2019 from Dallas College and received replacement three-year rolling contracts annually thereafter until 2022. At the time this lawsuit was filed, he was in the last semester of the three-year rolling contract he was issued in Spring 2021. He has been issued a new non-rolling three-year contract to begin Fall 2024 and runs through Spring 2027. Professor Day has consistently received "exceeds expectations" on his annual performance reviews.

3.10    Professor Day withdrew his application from Collin College in 2016, after being told he was a top candidate for a full-time geology position there, because of an offer from Dallas College. Specifically, Professor Day received an offer to teach full-time at Eastfield in the summer of 2016, at which time Dean Gretchen Reihl told him that Dallas College's rolling three-year contracts functioned like tenure, something Collin College could not offer. Later, when Professor Day signed his first rolling three-year contract in 2019, Dean Jess Kelley told him that these contracts were "our version of tenure."

Professor Jeff Hughes

3.11    Professor Hughes began as an adjunct at Dallas College in 1993, then served on a one-year probationary contract, teaching full-time, in 2006. His first rolling three-year contract began Fall 2007. He has served under rolling three-year contracts thereafter and, at the time this lawsuit was filed, was in the third year of the rolling three-year contract he was issued in 2021. He has been issued a two-year non-rolling contract for Fall 2024 through Spring 2026. As a professor

for the past thirty years, Professor Hughes has always met or exceeded expectations on his performance reviews.

3.12    In 1993, two "Charter" senior professors[6] told Professor Hughes that the rolling three-year contract was the equivalent of tenure. These were Ted Sherill, a biology professor at Eastfield, and Gayle Weaver, a professor of biology and anatomy and physiology at Eastfield. Professor Hughes decided to work full-time at Eastfield, as opposed to seeking employment elsewhere, because he was attracted to the job security offered by the rolling three-year contract.

## C.    Actions by Dallas College to Deprive Plaintiffs of their Property Interests

3.13    In May 2021, the Dallas College faculty, including Plaintiffs, were last issued rolling 3-year contracts, which began Fall 2021 and run through Spring 2024. Under the then-existing policies and long-standing practices of Dallas College, new three-year contracts would have been issued in May 2022, replacing the 2021-2024 contracts with 2022-2025 contracts. The district's policies were part of each Plaintiff's contract. In Spring 2022, under the policies then in effect, each Plaintiff should have received, but did not receive, a Fall 2022 to Spring 2025 contract. Thus, as of Fall 2022, instead of having three years of protected employment ahead of them, Plaintiffs had only the two years remaining on their 2021-2024 contracts. This was contrary to the established and mutually-understood practice and policy of Dallas College, and significantly changed the terms of Plaintiffs' employment. No due process was afforded Plaintiffs before Dallas College's failure to issue new three year contracts.

### Board discussion of ending the rolling three-year contracts

3.14    On January 11, 2022, the Board voted to remove the rolling three-year contracts and to instead pursue new contract, evaluation, and grievance systems for faculty that would

---

[6] The designation "Charter" was previously a form of recognition given to founding professors at Eastfield College (now the Eastfield campus of Dallas College).

eliminate the protections and property interest of the prior rolling three-year contract policy and related policies.

3.15    In June 2021, at a Dallas College Board work session, Trustee Diana Flores requested that the Board "look at the three-year rolling contract for faculty." She suggested that the board look at "that policy" and "any other related policy," and consider changing them. She expressed that the present system might be outdated, or not best serve Dallas College's students.

3.16    At a work session two months later, in August 2021, Robert Wendland, general counsel to Dallas College, addressed a Board work session, bringing with him a partner from the law firm of Ogletree Deakins. According to Mr. Wendland, the Board asked its lawyers "to specifically look into the rolling three-year contracts and whether or not those should be continued, and you've asked us to look into the role it has in shared governance and what that entails; academic freedom was implied in those discussions as well." Mr. Wendland suggested that the Board's interest was a result of "some of the information that you've received from some individuals and anonymous groups that were out there."[7]

3.17    These policy changes were the subject of communications from faculty association leaders such as Matt Hinckley, then-president of the Eastfield College Faculty Association. In October 2021, he reported to Eastfield faculty that then-Chancellor-Elect Justin Lonon had addressed "Faculty Contractual Security" in a meeting with the Dallas College Faculty Council. Policies threatening the security of faculty contracts, specifically the "faculty rolling three-year contracts," were, according to the report, not something the Board had been considering in 2020. The "rolling" part of the contract was about to be eliminated, Hinckley warned, blaming faculty

---

[7] The Plaintiffs, as explained below, were among the individuals Wendland referred to, and part of such not-so-anonymous groups. Frisella and Day, as well as Day's wife, were particularly outspoken, through an AAUP chapter and otherwise.

who had been "reflexively antagonistic toward Dallas College leadership and the Board." A true and correct copy of the email from Matt Hinckley to the Eastfield Faculty dated October 9, 2021, is attached hereto as <u>Exhibit A</u>.

3.18    Hinckley was recycling the "reflexively antagonistic" language, which he had debuted in an earlier email to Eastfield Faculty. On June 24, 2021, Hinckley blamed the Dallas College AAUP and its leadership for causing the Dallas College Board to review the policy regarding three year contracts. He explicitly stated that he was passing on information from "sources intimately familiar with the thinking of numerous trustees." His sources told him that "it was a June 22 letter from the 'Dallas College Chapter of the AAUP" which prompted Flores to begin looking at the faculty three-year contract. Below is a true and correct excerpt from such email:

**The Bad News: Concern about the Faculty Three Year Contract**
Unfortunately, it appears that the Board soon will review the faculty three-year contract. Specifically, Trustee Diana Flores asked the Board to review relevant policy pertaining to the faculty three-year contract at a future Board work session. (The particular discussion topic begins at <u>18:45 in the video of the June 23 work session</u>.)

While Trustee Flores raised this issue publicly in connection with the recent FOX4 story regarding the Mountain View dual credit student who could not contact his professor, sources intimately familiar with the thinking of numerous trustees confirm, in fact, that it was a June 22 letter from the "Dallas College Chapter of the AAUP" requesting "an immediate injunction" of the appointment of Dr. Lonon, that prompted Flores' impromptu remarks regarding the faculty three-year contract.

The Board did proceed with such review of policies, and eliminated those which had provided Dallas College faculty with their longstanding form of tenure.

**DMAB(LOCAL) – Changed to remove faculty's right to due process in case of nonrenewal**

3.19    Two specific policies which were changed were DMAB(LOCAL) and DCA(LOCAL).[8] On February 28, 2022, the first policy enacting such change was implemented, DMAB(LOCAL). A true and correct copy of the new policy is attached hereto as <u>Exhibit B</u> and incorporated herein by this reference. Notably, DMAB(LOCAL), until February 28, 2022, included the following language:

> A faculty member whose current employment with the College District has continued uninterrupted for the previous six years or more at the time he or she receives notice of intention to recommend nonrenewal shall be afforded the procedural rights in DMAA(LOCAL) even though he or she may be on a one-year contract at the time of such notice.[9]

A true and correct copy of the former DMAB(LOCAL) policy in effect until February 2022 is attached hereto as <u>Exhibit C</u> and incorporated herein for all purposes. The same protections were guaranteed to any faculty member on a three-year contract. *Id.* Plaintiffs were guaranteed such protections under that policy.

**DCA(LOCAL) – Changed to remove language under which new three-year contracts were offered annually after the first year of a three-year contract; under which three-year contracts were awarded following three years of service under one-year contracts; and under which the Board, and not the Chancellor, controlled the process**

3.20    As of May 2022, no new contracts were issued to Plaintiffs or any other faculty then under 2021-2024 contracts. DCA(LOCAL), however, at that time, still provided as follows:

---

[8] In totality, changes to multiple LOCAL policies secured the removal of the rolling three-year contract: DD, DLA, DCA, DMAA, and DMAB.

[9] DMAA(LOCAL) provides for due process of law in termination of faculty members mid-contract. A true and correct copy of such policy before the elimination of tenure is attached hereto as <u>Exhibit D</u> and incorporated herein by this reference. The reference to "nonrenewal of faculty members on three year contracts" was removed from the policy in 2023.

One-year faculty contracts shall normally be recommended for consideration at a May Board meeting.

Full-time faculty members may be employed for contractual periods of up to three years if the following conditions exist:

1. A faculty member has received a one-year contract for each of the first three years of faculty employment in the College District.

2. Upon completion of three consecutive years of faculty employment with the College District, a faculty member has rendered high-quality services to the College District as determined by the most recent rating obtained through the performance evaluation system established by the Chancellor.

At any time after the completion of the first year of a three-year contract, if a faculty member has an "effective" performance rating, he or she may be offered a successor three-year contract at the discretion of the Board.

A true and correct copy of the former DCA(LOCAL) as it existed in 2022 is attached hereto as

Exhibit E and incorporated herein by this reference.

3.21    On February 9, 2023, the second policy change to remove the rolling three-year contracts and faculty's longstanding tenure was adopted, and on July 5, 2023, the current version of DCA(LOCAL) was issued. A true and correct copy of such policy is attached hereto as Exhibit F and incorporated herein by this reference. Under the new DCA(LOCAL),

Full-time faculty contracts shall be issued in accordance with applicable laws and College District policies and administrative procedures, as promulgated by the Chancellor.

A faculty member who has rendered high-quality services to the College District, as determined in accordance with the College District's evaluation policy, and any procedures promulgated thereunder may be offered a multi-year contract, for a term of up to three years, in accordance with College District procedures. Nothing contained herein shall prohibit a recommendation of a contract term of less than three years for any such faculty member.

3.22    In addition to eviscerating the rolling three-year contract, the new DCA(LOCAL) reached back in time to take away rights from faculty who had signed their contracts under the previous policy:

All active full-time faculty contracts issued prior to the term contract revisions effective January 11, 2022, will be permitted to run through their current term, subject to the terms and conditions provided therein. Any subsequent renewal of a full-time faculty contract issued before January 11, 2022, shall be in accordance with terms provided herein. For full-time faculty contracts issued after January 11, 2022, the contract term shall be prescribed in accordance with this policy and related administrative procedures.

See Exhibit F.

**DMAA(LOCAL) – Changed to reflect the new DMAB(LOCAL), removing the due process guaranty for nonrenewal of faculty on three-year contracts.**

3.23    Dallas College, in policy DMAA(LOCAL), provided detailed due process procedures for faculty members who were terminated during the term of their contract, suspended without pay, "or for nonrenewal of faculty members on three-year contracts." Exhibit D, at 1, subheading "Due Process Procedures." Under such policy, a non-renewed faculty member on a three-year contract, had a right to a hearing and full procedural due process, at which the burden of proof was on the administrator, not the faculty member. "The burden of proof shall be upon the college president to show facts, by a preponderance of the evidence, that support the termination or nonrenewal." Exhibit D, at 3, ¶ 4.e.

3.24    Beginning in 2023, DMAA(LOCAL) no longer provides those due process protections to faculty in the case of nonrenewal. Faculty on three-year contracts are no longer protected against nonrenewal without cause. Their right to due process has been eliminated, and instead, they are left with the option to "present a grievance on an issue related to their nonrenewal." DMAB(LOCAL) Exhibit B. There is no longer any hearing at all other than a conference with the director of human resources. The administration needs no reason, and bears no burden of proof, under these new policies. Any vestige of the due process afforded Plaintiffs by the policies in place when they entered into their 2021-2024 contracts has been removed.

**Contracts issued after the last rolling three-year contracts ran out**

3.25    In May 2023, again, no new contracts were issued to Plaintiffs, or to any other faculty then under 2021-2024 contracts. In Fall 2023, the last fall semester of the 2021-2024 contracts, Dallas College issued new contracts to take effect Fall 2024 after the existing contracts expired in May 2024. Under the new policies, Professor Frisella received a one-year non-rolling contract, Professor Hughes received a two-year non-rolling contract, and Professor Day received a three-year non-rolling contract. Many, if not most, faculty across Dallas College received one-year or two-year contracts.

## IV.  CAUSES OF ACTION

4.1    ***Alternative Pleadings***.  To the extent necessary, each of the claims set forth below is pleaded in the alternative. Further, to the extent necessary, all allegations set forth above in the Factual Background section of this Complaint are hereby fully incorporated in each of the claims below by this specific reference, as though set forth in full, and all allegations set forth below under any of Counts 1 through 4 are hereby incorporated into all other counts, by this specific reference, as though set forth in full.

***42 U.S.C. § 1983: Deprivation of Procedural Due Process and Academic Freedom in Violation of the Fourteenth and First Amendment***

4.2    The Constitutional violations complained of herein were done by state actors—Dallas College, its Board, and its administration. All actions and decisions complained of herein were made by policymakers of the institution, acting under color of law.

4.3    The Board of Trustees of Dallas College (the "Board") is the final policymaker relating to faculty employment and tenure. *See* Tex. Educ. Code § 130.082. The Board adopts

policies, enacts regulations, and establishes general rules necessary for the operation of its campuses. *Id.* at § 130.040.

4.4     The moving force behind the violation of Plaintiffs' constitutional rights is the Board, and the policies which have been enacted and applied to Plaintiffs based on the Board's decisions. Accordingly, pursuant to 42 U.S.C. § 1983, Plaintiffs seek redress for the following violations of their rights, privileges, or immunities secured by the Constitution and laws of the United States.

**Count 1:     Violation of the 14th Amendment Brought Pursuant to 42 U.S.C. § 1983 – Deprivation of Property Interest without Procedural Due Process**

4.5     The 14th Amendment prohibits Dallas College from depriving Plaintiffs of their property interest in their tenured employment, or any other rights, privileges, and/or immunities secured under the U.S. Constitution without due process, and 42 U.S.C. § 1983 provides a mechanism for them to seek remedies for such deprivation. Plaintiffs no longer have the protections of a tenured employee; although still employed, they have been stripped of rights which they had by virtue of established policies of Dallas College, and each Plaintiff had a property interest in those terms and protections. Dallas College's wrongful conduct, as described herein, was a result of the Board, the final policymaker for Dallas College, setting out to eliminate tenure, to cripple academic freedom, and to silence and eliminate outspoken faculty.

4.6     In January 2022, the Board voted, and thereafter implemented and/or enacted, revisions to policies that removed protections afforded to faculty. One of those policies, DMAB(LOCAL), had granted due process under existing policy DMAA(LOCAL) to faculty under three-year contracts, and to faculty who had served continuously with the College District for six or more years, even if that service had been via one-year contracts. *See* Exhibits C and D.

4.7    The adoption of the Board's revisions to DMAA(LOCAL), DCA(LOCAL), DLA(LOCAL), and DD(LOCAL) did not occur until 2023. Nevertheless, Defendant deprived Plaintiffs (and others) of new 2022-2025 three-year contracts during Spring semester 2022, when they were entitled to such contracts based on policies and practices still in place. Plaintiffs (and others) were also owed, based on policies and practices still in place, new 2023-2026 contracts during Spring 2023, which did not occur.

4.8    As set forth in more detail above, in Section III which is specifically incorporated herein, Plaintiffs were never given notice, a meaningful opportunity to be heard, or any other form of due process in their deprivation of their rights under their 2021-2024 contracts, which included the previous policies —prior to or after their rolling three-year contracts ceased—thus depriving them of their cognizable property interest in ongoing employment beyond the term of a contract, employment on terms which prevented non-renewal without good cause, salary and benefits which they and their families could count on into the future provided no cause was shown to terminate them. Dallas College deprived Plaintiffs of all such property interests without due process. Dallas College's conduct violated Plaintiffs' procedural due process rights which are protected and guaranteed by the United States Constitution. Plaintiffs are entitled equitable relief restoring their previous status and protections, as well as actual damages, damages for mental anguish, and/or nominal damages for the deprivation of due process, in addition to attorney fees.

**Count 2:    Violation of First Amendment Brought Pursuant to 42 U.S.C. § 1983 – Denial of Liberty Interest in Academic Freedom, Freedom of Assembly, and Right to Petition a Governing Board for a Redress of Grievances.**

4.9    Academic freedom is a particular species of free speech, and is protected by the First Amendment to the United States Constitution. The Supreme Court of the United States has

stated that academic freedom is a "special concern" of the First Amendment.  Dallas College, in its policies, recognizes the right of its faculty to academic freedom.

4.10    It has long been recognized that tenure functions to protect academic freedom by insulating faculty from fear of reprisal, including dismissal, if they speak out or express unpopular opinions. Here, Dallas College took action to punish a faculty base which had conducted a vote of no confidence in the Chancellor. Additionally, on information and belief, Dallas College took action to punish their faculty base due to some faculty (including Plaintiff Paul Patrick Day) engaging in vocal and collaborative efforts to establish a faculty senate as an internal academic shared governance body of the college, as well as on account of some faculty (including Plaintiffs Paul Patrick Day and Plaintiff Salvator Frisella) establishing and holding membership in the American Association of University Professors ("AAUP"). The AAUP is an external, private, professional organization. Professor Day was among the nine founders of a Dallas College chapter of the AAUP, and served as its parliamentarian. Professor Frisella was an AAUP member. The local chapter of AAUP sent formal letters to the Dallas College Board of Trustees, critical of policies and actions by the Board and administration under the new "One College" policy. Faculty such as Matt Hinckley kept Justin Lonon and Provost Shawnda Floyd informed of AAUP's activities, maligning AAUP's members and even their most innocuous actions.

4.11    The Board and Chancellor Lonon used the activities of faculty such as Plaintiffs Day and Frisella, in the exercise of their First Amendment rights, as an excuse to give the Board and/or the Chancellor more power to terminate faculty, taking away the due process contained in the Dallas College policies. These policy revisions were an adverse action in retaliation against Plaintiffs Frisella's and Day's protected speech. The link between outspoken faculty and the end of the rolling three-year contract is related in the Matt Hinckley email attached as Exhibit A, and

even more explicitly in the other Matt Hinckley email excerpted in paragraph 3.18 above. It is further reflected in Board meeting videos and transcripts which show Board members eager to be able to end faculty employment *even mid-contract*, including at the December 2, 2021, Special Board Meeting.[10]

4.12    At that meeting, after it was pointed out that terminating a contract mid-term without cause implicated property rights, counsel explained that in practice, winding down had been used "with respect to the rolling three, that extends the contract out each year." If faculty on such a contract chose to go to reduced work load, winding down was used to "stop the extension . . . we won't automatically add another year." The Board asked, "what is the contract language that you are going to use so that faculty completely understands this is not automatic? You're not going to renew, renew, and if you're not performing, at year two or at year one, you're gone?" Counsel answered, "That language is in this proposed policy."

4.13    As set forth above, and in Exhibit A, the policies removing the three-year rolling contract were enacted to deprive faculty of tenure, of any protected property interest in the continuation of their contracts, in order to create a chilling effect against any faculty who would otherwise express contrary opinions, and a mechanism for the administration to rid itself of faculty seeking to organize to oppose actions by the Board and the Chancellor. Although the Board stripped faculty of their rights to three-year rolling contracts, the Chancellor, former Chancellor, and at least some administrators have been granted multi-year contracts, which have been renewed

---

[10]    https://dcccd.new.swagit.com/videos/148914    beginning at approximately 56:33. Later, near 1:13:00, Board Member Diana Flores states that getting rid of three year contracts entirely is "our only opportunity" after "all the pain that we've been through in this transition – of course that pain didn't touch faculty;" according to Ms. Flores, if even the possibility of a three-year contract were left in, administrators were going knuckle under to faculty. Board Member Zimmerman said that administrators should be given a chance, that "When you make changes of stopping the rolling three," the administration can "demonstrate whether they will enforce the value of that change." The Board made very clear that they hoped to drastically reduce the number of faculty on three-year contracts.

each year. Notably, the new Texas statute on tenure prohibits a college from awarding tenure to an administrator that varies from the institution's general policy on the award of tenure. *See* Tex . Educ. Code § 51.942(f).

4.14    Defendant has intentionally acted to withdraw the protection of the tenure system from its faculty, leaving Plaintiffs subject to the whims of administration as well as the Board, and to punitive withholding of multi-year contracts. This has been an intentional plan to chill academic freedom and punish Plaintiffs Frisella, Day, and others for exercising their First Amendment rights to freedom of assembly and right to petition. In addition to purporting to eliminate the three-year rolling contract tenure system, Defendant has revised its faculty evaluation process to provide a "holistic" (utterly non-transparent) system, under which faculty at the seven campuses are ultimately evaluated by a centralized group of administrators, rather than peers or even administrators with actual supervision of the faculty in question.

4.15    The policy changes have had their intended effect and Dallas College's extension of only a one-year contract to Frisella (and many other faculty previously entitled to rolling 3-year contracts) demonstrates Dallas College's willingness to act under the new policies, posing a credible threat to all faculty. Plaintiffs' speech has been chilled in at least the following ways: Frisella has withdrawn altogether from any AAUP activity. Frisella was known for challenging his dean when he observed injustice, or misconduct by administrators, but now he keeps his head down and avoids such conflict. Day, who was previously a very public and active proponent of a faculty senate, has stopped working towards that goal, stopped speaking out on issues of shared governance and faculty primacy, whether through advocating for a faculty senate or otherwise. He remains a member of AAUP at the national level, but has completely withdrawn from any participation in the Dallas College chapter of AAUP, if such chapter even exists.

4.16    In order to avoid the hostility at Eastfield, given the lies and accusations against himself and his wife, Day moved his office to the Cedar Valley campus. Both his health, and Frisella's health, have suffered as a result of Dallas College's conduct, including the exacerbation of stress-related illnesses. The stress and pressure which Dallas College brought to bear against Plaintiffs Day and Frisella in retaliation for their protected speech (see, e.g., Exhibit A), caused emotional distress and mental anguish, including physical manifestations thereof.

4.17    Plaintiffs were never afforded due process or presented with good cause to which they could effectively respond. They were essentially part of a collective punishment enacted by the Board, which evidently considered faculty to be virtually the enemy, and to chill academic freedom and other First Amendment rights; all of the conduct set forth above has deprived Plaintiffs Frisella and Day of their liberty interests guaranteed by the First Amendment without the procedural due process protections of the Fourteenth Amendment. Plaintiffs Frisella and Day are entitled equitable relief restoring their previous status and protections, which were taken away in retaliation for their protected speech and as a means of chilling future speech, as well as actual damages, damages for mental anguish, and/or nominal damages for the deprivation of due process, in addition to attorney fees. *Carey v. Piphus*, 435 U.S. 247, 266-267, 98 S. Ct. 1042 (1978) (awarding nominal damages for a violation of procedural due process); *see also Uzuegbunam v. Preczewski*, 592 U.S. 279, 284-85, 141 S. Ct. 792, 797 (2021) (university's revocation of anti-free speech policy did not destroy student's standing, since award of nominal damages would redress the constitutional violation.)

*Pendent State Law Claims*

**Count 3:**    **Breach of Contract**

4.18    As set forth above, the policies of Dallas College were a part of each Plaintiff's employment contract, entered into in 2021. As set forth above, each Plaintiff entered into a 3-year rolling contract in 2021, for Fall 2021-Spring 2024.

4.19    In Spring 2022, Dallas College breached its own policies by its failure to issue new 3-year rolling contracts to existing, qualified faculty, including each of Plaintiffs. Prior to the 2023 implementation of the new DCA(LOCAL) policy, each Plaintiff was entitled, under the existing policies of Dallas College, to the 3-year rolling contract form of tenure under which they executed their 2021-2024 contracts, and all prior contracts. As set forth above, these contracts were described by Board members, administrators, and counsel for Dallas College, in 2021 and 2022 meetings, as three-year rolling contracts, as automatic three-year contracts, and as vested property interests. In October 2021, associate general counsel Tricia Horatio explained to the Board's Education Workforce Committee that the concept of a rolling contract constitutes "quasi-tenure," creates a situation in which a vested property right in the contract term is virtually perpetual, and requires a due process hearing prior to non-renewal. She spoke of retirement or death as the only end-point for employment of a professor on a rolling three-year contract.[11] A true and correct copy of her slide, using the term "quasi-tenure," and showing that the protected property right had been established at Dallas College at least since 1987, and possibly since 1965, is as follows:

---

[11] https://dcccd.new.swagit.com/videos/141190  at 11:58 - 14:00

**The Dallas College Rolling 3-year Policy**

Dallas College Board Policy DCA (LOCAL) contains language which provides "At any time after the completion of the first year of a three-year contract, if a faculty member has an "effective" performance rating, he or she may be offered a successor three-year contract at the discretion of the Board."

 This language has been in Policy for as long as our archival records exist (since **1987**) and anecdotally has been said to have existed since **1965**.

 The concept of a rolling contract constitutes "quasi tenure"; creates a situation in which a vested property right in the contract term is **virtually perpetual**; and requires termination of the contract only through a **due process hearing**.

Education Workforce Committee

*See* Exhibit G.

4.20    The Board knew that its policies entitled Plaintiffs to automatic renewal of their contracts,[12] and in the middle of the term of Plaintiffs' 2021-2024 contracts, they changed the policies, thereby breaching Plaintiffs' contracts. This breach of contract has caused damage to Plaintiffs, for which they here sue. They lost their tenure rights, and seek equitable relief making them whole, in the form of permanent injunctive relief restoring their previous status and rights, or, alternatively, actual damages representing the value of their tenure rights.

4.21    Additionally or alternatively, Dallas College has breached the specific contracts between each Plaintiff  and Dallas College by failing to replace such contracts in 2022 without the required demonstration of good cause, and procedural due process, as set forth in the policies which were in place at all relevant times. If Dallas College was not going to issue a new 3-year rolling contract to each Plaintiff (and its other faculty), the policies in place until February 2023

---

[12] *See* Exhibit H, at p. 5, referring to "the removal of the automatic three-year contract for faculty."

required good cause and procedural due process, which were not afforded Plaintiffs. This breach of contract has caused damage to Plaintiffs, for which they here sue.

*Violation of the Texas Open Meetings Act*

**Count 4:** **Violation of the Texas Open Meetings Act, and Request for Injunctive and/or Mandamus Relief**

4.22    Chapter 551 of the Texas Government Code (the "Texas Open Meetings Act" or "TOMA") provides that meetings of governmental bodies must be open to the public (except for expressly authorized executive sessions). The Texas Open Meetings Act applies to Dallas College's Board. As interested persons, Plaintiffs have standing to bring an action by mandamus or injunction to reverse a violation of TOMA, pursuant to § 551.142(a)-(b).

4.23    On information and belief, the decisions and votes taken by the Board at the January 2022 meeting, and at subsequent meetings when the specific policy changes described herein were adopted, were the result of violations of the Texas Open Meetings Act.

4.24    Throughout that time period, the Board's agendas did not specify the subject matter of the Board's executive sessions. Only boilerplate recitation of the broad matters permitted to be discussed in executive session were made public. The changes to policies complained of herein were discussed in executive sessions – at best – but the public had no notice, and no ability to be heard on the issue. *See Cox Enterprises v. Bd. of Tr. of Austin ISD*, 706 S.W.2d 956, 958-959 (Tex. 1986) (compliance with TOMA requires full and adequate notice, sufficient to alert a reader as to the action being considered, if a board is to deliberate in executive session).

4.25    In reality, on information and belief, trustees considered friendly to the administration were consulted privately by the Chancellor, so that even in executive sessions, there was insufficient information for real deliberation by all Trustees. In further violation of TOMA,

upon information and belief, there are no minutes of the Board's executive sessions, and certainly no minutes of the private consultations.

4.26    Even from the public record, it is obvious that the Board deliberated in secret, made decisions in secret, and that no minutes were kept of the secret meetings. An example is set forth above, in ¶ 3.16, when Dallas College's general counsel stated to the Board, "You've asked us to look into the rolling three year contracts," which had in fact been stated in open meeting. But he went on to say, "you've asked us to look into the role it has in shared governance and what that entails; academic freedom was implied in those discussions as well."  The public had no prior notice before the Board made such decision to ask for counsel on the issues of academic freedom or shared governance. This is one of a much longer series of deliberations related to the policy changes complained of herein, for which the public had no notice, and of which there is no record.

4.27    Moreover, in 2021, members of Dallas College's administration, including its Chancellor, met with Board members individually or in groups in a furtive manner to circumvent § 551.002's  prohibition on a quorum of the Board meeting in private to deliberate over public business. Until that time, all Board members who visited Dallas College's administrative headquarters had to sign in and out. In 2021, such protocol was lifted, and the previously available record of Board member meetings with the Chancellor or other top administrators was not kept. Matt Hinckley's October 2021 email (Exhibit A) indicates that the Chancellor-Elect was making assurances to select members of Dallas College faculty as to how the Board would vote, and why. Further, Matt Hinckley conveyed in another email to Eastfield faculty, as excerpted above in ¶ 3.18, that he had access to ""sources intimately familiar with the thinking of numerous trustees."

4.28    When the Board finally considered the 2023 policy changes complained of herein, the decision appears on the Consent Agenda of the Board's regular February 2023 meeting, policy

item 8.3b.[13] The introductory wording on the policy amendments is as follows: "In January 2022, as part of the removal of the automatic three-year contract for faculty, the Board approved amendments to local policies DCA and DMAB." These were presented as a done-deal, with no real notice to the public of any deliberation.

4.29    While the Texas Open Meetings Act lists certain exceptions to the general requirement of open meetings, § 551.143 provides that a member or group of members of a governmental body commits an offense if the member or group of members knowingly conspires to circumvent TOMA by meeting in numbers less than a quorum for the purpose of secret deliberations in violation of the Texas Open Meetings Act. The decision-making process of the Dallas College Board was calculated to avoid scrutiny, taking place outside the public eye, and even outside the presence of all elected Trustees. Mike Hinckley was able to report on how Trustees were approaching issues, not based on publicly recorded votes or statements at public meetings, but based on information from "sources intimately familiar with the thinking of numerous trustees." This is exactly what TOMA is meant to prevent. Trustees perceived as disloyal, or not part of the inner circle, were treated as Trustees in name only, and excluded from the real decision-making process. In this way, and in violation of TOMA, Dallas College deprived the public of its role in overseeing and holding accountable the elected Trustees.

4.30    The actions of the Board complained of herein were all taken as the result of secret deliberations, prohibited by TOMA. Accordingly, the Plaintiffs seek injunctive relief prohibiting Dallas College from enforcing the changes to policies DCA(LOCAL), DMAB(LOCAL), DMAA(LOCAL), DLA(LOCAL), and DD(LOCAL), and requiring Dallas College to restore the former versions of each such policy.

---

[13] See Exhibit G, which includes excerpted 1-4 and 33-38 of Dallas College Regular Meeting Notice and Agenda for Thursday, February 9, 2023.

## V.  REQUESTED RELIEF

5.1    Plaintiffs have been damaged as a direct and proximate result of Dallas College's actions, as alleged herein. Accordingly, Plaintiffs seek to recover all of their actual damages, including mental anguish damages. Alternatively, because Plaintiffs were deprived of their procedural due process rights, Plaintiffs are entitled to at least $1.00 in nominal damages in any event and all attorney's fees. *See Carey v. Piphus*, 435 U.S. 247, 266 (1978) (holding that the denial of procedural due process should be actionable for nominal damages without proof of actual injury). In addition, Plaintiffs seek all other equitable and injunctive relief which may be available to them, including, injunctive relief and/or equitable relief requiring Defendant to provide them with full due process hearings and/or reinstatement of their tenure or restoration to them of their rolling 3-year contracts, and the protections previously afforded them thereunder.

5.2    Further, pursuant to Texas Government Code § 551.142(a)-(b), Plaintiffs seek injunctive relief from the policies enacted to eliminate the 3-year rolling contracts at Dallas College, based on the violations by some or all of the Board of the Open Meetings Act; specifically, they seek relief in the form of an injunction against the enforcement by Dallas College of the versions of DMAB(LOCAL), DMAA(LOCAL), DLA(LOCAL), and DD(LOCAL), enacted in 2022 and thereafter, and enjoining Dallas College from failing to restore the former versions of each such policy.

## VI.  FEES, COSTS, AND INTEREST

6.1    Plaintiffs have retained the law firm of Hill Gilstrap, P.C. to represent them in connection with this matter, and have agreed to pay the law firm any and all reasonable and necessary attorney's fees and costs in connection with such representation. Without waiving and/or limiting any other relief requested in this Complaint, Plaintiffs seeks to recover, to the extent

permitted by applicable law, including but not limited to 42 U.S.C. §§ 1988, Chapter 37 of the Texas Civil Practices and Remedies Code, and the Uniform Declaratory Relief Act, all of Plaintiffs' reasonable and necessary attorney's fees and costs to be incurred herein, in such amount as is equitable and just from the Defendant.

6.2    Plaintiffs are also entitled to and seek to recover costs of court, along with pre-judgment and post-judgment interest at the maximum rate permitted by law.

## VII.  **CONDITIONS PRECEDENT**

7.1    All conditions precedent to the Plaintiffs' recovery on the claims alleged herein have been performed or have occurred.

## VIII.  **DEMAND FOR JURY TRIAL**

8.1    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs request a jury trial and have tendered, or will tender, the requisite fee.

## **PRAYER**

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request that upon final hearing, Plaintiffs recover judgment against Defendant and be awarded:

(a)    any and all amounts recoverable and/or recognizable as damages under law and/or in equity, resulting and/or occasioned by the wrongful acts and/or conduct of Defendant (as set forth above more specifically), including both actual and nominal damages;

(b)    their litigation expenses and costs, including but not limited to their attorneys' fees and costs and any applicable expert fees;

(c)    costs of court, pre-judgment and post-judgment interest, at the maximum rate as allowed by law; and

(d)    such other and further relief, both general and special, at law or in equity, to which they may be justly entitled.

Respectfully submitted,

*/s/ Frank Hill*
Frank Hill – SBN 09632000
fhill@hillgilstrap.com
Stefanie Klein – SBN 11565650
sklein@hillgilstrap.com

HILL GILSTRAP, P.C.
1400 W. Abram St.
Arlington, Texas 76013
(817) 261-2222
(817) 861-4685 FAX

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of this document has been served upon all parties via the Court's electronic filing system on November 5, 2024.

*/s/ Stefanie Klein*
Stefanie Klein

# Exhibit A

**From:** "Hinckley, Matt" <MattHinckley@dcccd.edu>
**Date:** October 9, 2021 at 12:11:49 PM CDT
**To:** "Hinckley, Matt" <MattHinckley@dcccd.edu>
**Subject: EFCFA Update - Oct. 9, 2021**

Dear Eastfield Faculty,

The Dallas College Faculty Council, on which I serve as Eastfield's representative, met Friday with Chancellor-Elect Justin Lonon, for its regularly scheduled monthly meeting.

The meeting was an excellent exchange in which the Council had an opportunity to share with Dr. Lonon, an expanded explanation of the concerns that Eastfield faculty shared with Drs. Lonon and Floyd on Monday, Oct. 4.

Just like many Eastfield faculty remarked to me that they "felt like Drs. Floyd and Lonon listened to us and they heard us" on Oct. 4, the Council similarly remarked that we felt like Dr. Lonon heard our concerns and assured us that many of the problems would be addressed.

Some faculty even have remarked to me that they have seen a change in recent days in the tone of their particular School leadership.

Good things can happen when faculty and administrators speak openly with one another. We are all on the same side; we are all here for our students. We just have different perspectives on how best to achieve that.

To be sure, last year's Faculty Council communication with Drs. May and Lonon was woefully inadequate, because the Council's president made countless ill-considered decisions that other Council members and I advised him not to make.

And while this year's Council is working better so far, the antiquated structure of the Faculty Council – one campus, one vote – still leaves us with School-sized blind spots.

## Faculty Contractual Security Update

As Dr. Lonon reported to the Council on Friday, the Board of Trustees, **which wasn't paying attention to the faculty rolling three-year contract in April 2020**, is now set during the Nov. 9 meeting to have a first reading of a proposed policy revision to eliminate the "rolling" part of the contract. Presumably the Board would then be expected to vote to approve such a policy at the Dec. 7 meeting.

**Let me be clear: This development is entirely the fault of a small group who – despite my repeated admonition that their tactics were unwise and would backfire – have made it a point to act reflexively antagonistic toward Dallas College leadership and the Board of Trustees.**

Thankfully, Dr. Lonon believes he can prevail upon enough members of the Board to retain the "three year" contractual term. In other words, faculty who continue meeting or exceeding expectations would be able to expect to be offered a new three-year contract as their existing three-year contract is ending.

Provided, of course, that no one takes actions that lead to further damage with the Board of Trustees.

## We Didn't Need a "Vote of No Confidence."

Thanks to:

- The current Faculty Council issuing a public statement that the DCFA has no connection to, and does not support, the "Vote of No Confidence;"
- The "Noble Petition" which has now gained 61 co-signers;
- Dallas College faculty like Carlos Ojeda, Erin Kelly, and Scott Sires speaking at the Oct. 5 Board meeting; and
- Additional faculty both on and off the Council engaging productively with Board members before and after the Oct. 5 meeting;
-

I believe we have – for the present moment – managed to contain any further reputational damage to faculty, with the Board of Trustees.

**Unfortunately, the public reputation of Dallas College faculty continues to suffer because of the "Vote of No Confidence."**

Specifically, the "Vote of No Confidence" has caused *The Dallas Morning News* to publish an editorial opposing the "Vote of No Confidence" and supporting Chancellor May. I attach a PDF of that editorial for your review.

And even though the editorial is clear that only "a minority of full-time faculty" supported the "Vote of No Confidence," all faculty have been made to look bad in the court of public opinion and in the only major daily newspaper in the region.

To be sure, I realize that most of the 22.7 percent of full-time faculty who voted yes on the "Vote of No Confidence" felt like they had no other recourse.

**I empathize with you. I hear your concerns, and I share them.**

But my quarrel is with those who orchestrated the "Vote of No Confidence" behind the scenes but didn't attach their name to it. These are the same people who:

- Advanced intellectually dishonest and discredited interpretations of "academic freedom, "shared governance," and SACSCOC principles of accreditation;
- Tried to gain control of DCFA legal defense funds to litigate their beliefs in court when even the DCFA attorney told all of us at the November 2020 DCFA convention that no judge would rule in their favor;
- Launched an outside organization when an election didn't go their way;
- Sent anonymous antagonistic letters to the Board of Trustees;
- Contrived Freedom of Information Act requests and petty grievances simply to harass those they deem "enemies;"
- Are now publishing anonymous press releases and setting up fake social media accounts to take their crusade into the news media.
-

Aren't we tired of these reflexively antagonistic actions making us all look bad?

## There Are Better Ways to Achieve Reform

We have legitimate operational issues and concerns. **The appropriate place to discuss those issues and concerns is with our administration, through the appropriate channels.**

And further, **we need to broaden the structure of the DCFA Faculty Council to include a representative not only from each campus, but also from each School, and we need to elect the officers at-large.** In the coming days, I will share with you some draft proposals to amend the DCFA Constitution and Bylaws, that if approved at the Nov. 12 convention, would do just that.

Let's work together, in Person-Centered partnership with the administration, to make Dallas College everything we want it to be, and everything our students deserve us to be.

Thank you,

Matt Hinckley (he/him/his)
Professor of History, Dallas College School of Law and Public Service
President, Eastfield Campus Faculty Association, 2020-2022
matthinckley@dcccd.edu
"I am here to help you succeed!"

# Exhibit B

Dallas College
057501

TERM CONTRACTS                                                    DMAB
NONRENEWAL                                                      (LOCAL)

**Faculty Members on Full-Time Faculty Contracts**

The employment of a faculty member serving on a full-time faculty contract may be concluded at the end of the contract term. If it is the intent of the College District not to recommend renewal of a faculty member's contract for the ensuing academic year, the faculty member shall be notified, in writing, in accordance with applicable laws and College District policies and procedures. If the term of the contract is one year, such notice will be provided in the current contract year; if the contract term is longer than one year, notice may be provided in or before the final year of the contract term.

**Grievance Rights**

The Board designates the director of human resources as the person to whom faculty members may present a grievance on an issue related to their nonrenewal.

A faculty member may, within ten days after receipt of such notice, submit to the chief human resources officer a written request to present a grievance on the matter of intention to recommend nonrenewal.

If a grievance request is not received, the nonrenewal shall become effective as described in the notice.

Once a request to present a grievance has been filed, the conference shall normally be scheduled within seven working days.

# Exhibit C

TERM CONTRACTS                                                      DMAB
NONRENEWAL                                                        (LOCAL)

**Faculty Members on One-Year Contract**

The employment of a faculty member serving on a one-year contract may be concluded at the end of the contract term. If it is the intent of the College District not to recommend renewal of a faculty member's contract for the ensuing academic year, the faculty member shall be notified, in writing, usually by the Vice President of Instruction, on or before the last day in March of the current contract year.

A faculty member whose current employment with the College District has continued uninterrupted for the previous six years or more at the time he or she receives notice of intention to recommend nonrenewal shall be afforded the procedural rights in DMAA(LOCAL) even though he or she may be on a one-year contract at the time of such notice.

**Faculty Members on Three-Year Contract**

If it is the intention of a supervisor to recommend against re-employment of a faculty member who is on a three-year contract, the supervisor shall normally confer with the college president, and, if the college president concurs in the intention not to re-employ the faculty member, the supervisor must inform the faculty member by memorandum on or before the first day of March of the final year of the three-year contract. This memorandum shall contain a full statement of the reasons why renewal of the contract will not be recommended.

**Request for Hearing**

A faculty member may, within ten days after receipt of such memorandum, submit to the college president a written request for a hearing on the matter of intention to recommend nonrenewal.

The hearing shall be held according to procedures in DMAA(LOCAL).

If a hearing is not requested, the nonrenewal shall become effective as described in the notice.

**Grievance Filed Under Education Code 51.960**

The Board designates the director of human resources as the person to whom a faculty member may present a grievance on an issue related to his or her nonrenewal.

If a faculty member wishes to present a grievance under Education Code 51.960, it is recommended that he or she file a request to present the grievance within ten working days after final action on the nonrenewal proceeding.

Once a request to present a grievance has been filed, the conference shall normally be scheduled within seven working days.

# Exhibit D

TERM CONTRACTS                                                                DMAA
TERMINATION MID-CONTRACT                                                    (LOCAL)

| | |
|---|---|
| **Suspension with Pay** | A term contract employee may be suspended with pay and placed on administrative leave by the Chancellor or designee during an investigation of alleged misconduct by the employee or at any time the Chancellor or designee determines that the College District's best interest will be served by the suspension. |
| **Suspension Without Pay** | A term contract employee may, for good cause, be suspended without pay for a definite period of time set by the Board, provided that the employee has been given written notice of the allegations constituting good cause for the suspension and, before the suspension is imposed, has been afforded an opportunity for a hearing that complies with the time lines and procedural requirements set out above. |
| **Involuntary— Faculty** | Termination procedures for faculty members shall ensure due process of law. Excellence in instruction and quality education generally require that faculty members be periodically evaluated to determine whether or not their employment with the College District shall continue. Faculty personnel may be terminated only in accordance with the principles set forth in the following procedures: |
| | If a faculty member serving on a one-year contract is terminated for either academic or disciplinary reasons prior to the expiration of the contract term, he or she shall be afforded the notice and hearing rights described below. These rights would apply to anyone on a contract. |
| **Due Process Procedures** | Due process procedures for faculty members for terminations during a contract term, for suspension without pay, or for nonrenewal of faculty members on three-year contracts are as follows: |
| Written Request for Hearing | 1. Upon written notification, the employee may, within ten days, submit to the college president or Chancellor, as appropriate, a written request for a hearing. A hearing officer shall be selected as described below. |
| Hearing Panel Selection | 2. Each academic year, the Chancellor shall, with the advice and consultation of the faculty council, select a panel of not less than five potential hearing officers. Members of this panel shall be persons who are qualified in their understanding of hearing procedures and who are not College District employees. The hearing officers so selected shall have the power to administer an oath, and the testimony from all witnesses shall be under oath. Additionally, the Chancellor shall, with the advice and consultation of the faculty council, name no less than three alternate members of this panel. The names of the panel members and of the alternates shall be provided to the college presidents and to the members of the faculty council no later than February 15 of each academic year. |

DATE ISSUED: 4/26/2017                                                      1 of 4
UPDATE 32
DMAA(LOCAL)-X

Dallas College
051.057

TERM CONTRACTS                                                                    DMAA
TERMINATION MID-CONTRACT                                                        (LOCAL)

|   |   |   |
|---|---|---|
|   | 3. | When a hearing is requested, the faculty member shall be provided with a list of the hearing officer panel members and hearing officer alternate panel members. |

Within five days after the day when the list of potential hearing officers has been delivered to the faculty member, the faculty member and the college president shall meet in the presence of a notary public and shall select the hearing officer in the following manner: The faculty member shall first strike off a name from the list; then the college president shall strike off a name, and so on, in this fashion until only one name remains.

The notary public shall provide this information to the Chancellor, who shall notify the hearing officer whose name was not stricken. In the event such hearing officer is unable to serve within the prescribed time period, the potential hearing officer whose name was stricken last shall be requested to serve.

Hearing  4.  The hearing shall be held at a place and time named by the hearing officer, in consultation with the college president, and the faculty member; provided however, that the hearing shall not be held on the campus of any of the colleges of the College District, or in the College District offices. The hearing shall be convened within a reasonable time after the selection of the hearing officer.

Expenses of the hearing shall be borne by the College District, with the exception of any fees charged to the faculty member by legal counsel.

The hearing shall be closed unless the faculty member requests that it be open. If the faculty member wishes the hearing to be open to the public, he or she shall make this wish known by delivering such a request, in writing, to the hearing officer, not less than 72 hours prior to the scheduled time for the hearing to begin. Upon receiving this request, the hearing officer shall promptly notify the college president, in writing, that the hearing shall be open to the public. The hearing shall be conducted by the hearing officer in the manner that he or she deems most appropriate, within the guidelines specified herein including the provisions that:

a.  The faculty member and the college president shall have the right to be represented by counsel if they choose.

b.  The faculty member shall have the right to face and to question those persons on whose judgments and opinions the recommendation against reemployment is based.

TERM CONTRACTS                                                        DMAA
TERMINATION MID-CONTRACT                                           (LOCAL)

|  |  |  |
|---|---|---|
|  | c. | The faculty member and the college president shall have the right to present facts and to bring forward witnesses. |
|  | d. | Witnesses shall be placed under oath by the hearing officer. |
|  | e. | The burden of proof shall be upon the college president to show facts, by a preponderance of the evidence, that support the termination or nonrenewal. |

Records and Findings

5. The proceedings of the hearing shall be tape recorded, and the recordings shall be held by the hearing officer for his or her own examination. A copy of the tapes shall be provided to the faculty member and to the college president upon request. The hearing officer shall base his or her findings solely upon the record of the hearing. Following the conclusion of the hearing, the hearing officer shall, within seven days, deliver a finding of fact in writing to the college president, to the faculty member, and to the Chancellor. In addition to the findings of fact, the hearing officer shall include a conclusion based on the facts that the reasons supporting the contemplated termination or nonrenewal have or have not been sustained.

Chancellor Consideration

6. The Chancellor shall consider the written report of the hearing officer in determining his or her recommendation to the Board concerning the reemployment or nonreemployment of the faculty member. Within ten days after delivery of the report of the hearing officer to him or her, the Chancellor shall deliver to the faculty member a copy of his or her judgment in writing.

Board Review

7. The Board may accept the recommendation of the Chancellor after examination of the hearing officer's report and the judgment of the Chancellor. If the Board determines to review the appeal further, the proceeding is appellate in nature (not de novo) and is limited to the evidence presented at the hearing provided in item 5, above.

Publicity Concerning Termination Procedures

8. In all proceedings, confidentiality of testimony shall be preserved in keeping with applicable state law. In the event a public statement from a College District spokesman is deemed appropriate, such statement shall be issued by the college president or the Chancellor.

**Suspension**

When the welfare of the institution or its students is deemed to be endangered by the presence of a faculty member, the Chancellor or college president may suspend such employee pending further study to determine appropriate action. The faculty member shall be notified of the suspension and the cause or reason for such suspension. The faculty member, upon receipt of said notice, shall

Dallas College
03.054

TERM CONTRACTS                                                    DMAA
TERMINATION MID-CONTRACT                                        (LOCAL)

have the right to request a hearing, which shall follow the procedure prescribed at DUE PROCESS PROCEDURES, above.

# Exhibit E

Dallas College
05-554

| EMPLOYMENT PRACTICES | DCA |
|---|---|
| TERM CONTRACTS | (LOCAL) |

**General Provisions**

All term contracts shall be in writing on a form approved by the Board, setting forth the length of the contract and other terms and conditions of employment. In most circumstances, contracts shall not be for specific assignments but shall indicate employment as "faculty" or "administrator." No term contract shall be valid or binding on the Board until approved by Board action. Contracts shall be signed by the employee and the Board's designee.

The Chancellor, upon recommendation of the appropriate staff, shall recommend contracts for approval.

In exceptional circumstances, the Chancellor may authorize the employment of personnel when, in the opinion of the Chancellor, the deferral of employment authorization until the next regular Board meeting would cause a disruption in the operation of the College District. The terms of employment of such personnel must conform to policies in this manual concerning compensation, workload, benefits, and the like. Personnel so authorized shall be submitted to the Board for ratification at the earliest practical time.

Unless expressly authorized elsewhere in this manual, no employee has the authority to offer or promise to offer a contract of employment to any person without authorization from the Board. Nor shall any person expect to receive a contract of employment until the Board authorizes the contract and the appropriate personnel execute such contract. Neither renewal of employment contracts nor other employment procedures or practices shall give rise to an expectation of continued employment beyond the term of the contract or a belief in de facto tenure.

**Administrative Personnel**

Administrative contracts shall normally be issued for the fiscal year. Contracts may be issued for periods of less than 12 months, based upon length of service required.

An administrator who, in the opinion of the Chancellor, has significant administrative duties such that it would be in the best interest of the College District to enter into a contract of employment for a term longer than one year may be eligible to receive a contract for a term not to exceed three years upon recommendation from the Chancellor, provided that nothing contained herein shall prohibit a recommendation of a contract term of less than three years for any such administrator. Persons eligible for such a contract shall be direct reports to the Chancellor.

Before completion of the first year of a contract, for any administrator with a contract term longer than one year, the Chancellor shall evaluate the administrator to determine whether to recommend another contract of the same term or a contract of another term, up to

EMPLOYMENT PRACTICES                                              DCA
TERM CONTRACTS                                                (LOCAL)

and including a three-year contract. At any time after the completion of the first year of a three-year contract, an administrator with a three-year contract term, having been evaluated by the Chancellor and upon recommendation of the Chancellor, may be offered a successor three-year contract at the discretion of the Board.

**Faculty**

One-year faculty contracts shall normally be recommended for consideration at a May Board meeting.

Full-time faculty members may be employed for contractual periods of up to three years if the following conditions exist:

1.  A faculty member has received a one-year contract for each of the first three years of faculty employment in the College District.

2.  Upon completion of three consecutive years of faculty employment with the College District, a faculty member has rendered high-quality services to the College District as determined by the most recent rating obtained through the performance evaluation system established by the Chancellor.

At any time after the completion of the first year of a three-year contract, if a faculty member has an "effective" performance rating, he or she may be offered a successor three-year contract at the discretion of the Board.

Faculty members serving a three-year contract may request, in writing, a reduced load during the term of their contract. When a faculty member makes such a request and is granted a reduced load, no additional multi-year contract will be offered. Upon approval of a request for a reduced load, the faculty member shall be placed in "wind-down" contractual status, with a proportionate reduction in compensation, and shall continue to serve at such reduced contract level for the remainder of the term of his or her employment contract. For purposes of this provision, "wind-down contractual status" refers to effective nonrenewal of a multi-year contract.

Once approved, a reduced contract request may not be withdrawn by the faculty member. Accordingly, the contractual workload may not thereafter be increased, except as necessary to meet extenuating circumstances for the benefit of the College District or as required by law. Any increase in contractual workload after a reduction shall be approved in writing by the Chancellor. The Chancellor shall promulgate procedures for the submission and evaluation of requests for reduced load.

Dallas College
05 034

EMPLOYMENT PRACTICES                                           DCA
TERM CONTRACTS                                               (LOCAL)

|  |  |
|---|---|
|  | Requests for modifications or reductions to faculty load that may otherwise be authorized by law or College District policy shall be considered and/or provided in accordance with same. |
| Part-Time Faculty | Part-time faculty members shall be employed under a contract for part-time credit teaching that shall include a special employment agreement and an addendum listing part-time faculty responsibilities. |

# Exhibit F

EMPLOYMENT PRACTICES                                            DCA
TERM CONTRACTS                                              (LOCAL)

**General Provisions**    All term contracts shall be in writing on a form approved by the Chancellor, setting forth the length of the contract and other terms and conditions of employment. In most circumstances, contracts shall not be for specific assignments but shall indicate employment as "faculty" or "administrator." No term contract shall be valid or binding on the Board until approved by the Chancellor. Contracts shall be signed by the employee and the Chancellor's designee.

Unless expressly authorized elsewhere in this manual, no employee has the authority to offer or promise to offer a contract of employment to any person without authorization from the Chancellor. Nor shall any person expect to receive a contract of employment until the Chancellor authorizes the contract and the appropriate personnel execute such contract. Neither renewal of employment contracts nor other employment procedures or practices shall give rise to an expectation of continued employment beyond the term of the contract or a belief in de facto tenure.

**Administrative Personnel**    Administrative contracts shall be issued in accordance with applicable laws and College District policies and administrative procedures, as promulgated by the Chancellor.

An administrator who, in the opinion of the Chancellor, has significant administrative duties such that it would be in the best interest of the College District to enter into a contract of employment for a term longer than one year, and who has rendered high-quality services to the College District as determined in accordance with the College District's evaluation policy, and any procedures promulgated thereunder, may be offered a multi-year contract, for a term of up to three years, in accordance with College District procedures. Persons eligible for such a contract shall be members of the Chancellor's leadership team. [See BG(REGULATION)]

Renewal    Unless an employee on an administrator contract is otherwise notified by the Chancellor or a designee in accordance with applicable laws and College District policies and procedures, and before the expiration of the contract term, the employee will be employed by the College District for a successive term of up to one year, subject to a written, approved, and executed contract being timely filed with Human Resources. The position and terms of employment for the successor term will be determined by the College District in its sole discretion and included in the written contract. In no event will any contractual employee have any property right to or expectation of continued employment with the College District beyond the term of the contractual employee's contract or any successor contract.

Nothing contained herein shall prohibit a recommendation of a contract term of less than one year for any administrator if it is determined, at the sole discretion of the Chancellor or a designee, that

EMPLOYMENT PRACTICES                                    DCA
TERM CONTRACTS                                      (LOCAL)

such recommendation is determined to be in the best interest of the College District.

All active administrator contracts issued prior to the term contract revisions effective January 11, 2022, will be permitted to run through their current term, subject to the terms and conditions provided therein. Any subsequent renewal of an administrator contract issued before January 11, 2022, shall be in accordance with the terms provided herein. For administrator contracts issued after January 11, 2022, the contract term shall be prescribed in accordance with this policy and related administrative procedures.

**Faculty**

Part-Time Faculty

Part-time faculty members shall be employed under a contract for part-time credit teaching that shall include a special employment agreement and an addendum listing part-time faculty responsibilities.

Full-Time Faculty

Full-time faculty contracts shall be issued in accordance with applicable laws and College District policies and administrative procedures, as promulgated by the Chancellor.

A faculty member who has rendered high-quality services to the College District, as determined in accordance with the College District's evaluation policy, and any procedures promulgated thereunder may be offered a multi-year contract, for a term of up to three years, in accordance with College District procedures. Nothing contained herein shall prohibit a recommendation of a contract term of less than three years for any such faculty member.

Renewal

Unless a full-time faculty member who is on a faculty contract is otherwise notified by the Chancellor or a designee in accordance with applicable laws and College District policies and procedures, and before the expiration of the contract term, the faculty member will be employed by the College District for a successive one-year term, subject to a written, approved, and executed contract being timely filed with Human Resources. The position and terms of employment for the successor one-year term will be determined by the College District in its sole discretion and included in the written contract. In no event will any contractual employee have any property right to or expectation of continued employment with the College District beyond the term of the contractual employee's contract or any successor contract.

All active full-time faculty contracts issued prior to the term contract revisions effective January 11, 2022, will be permitted to run through their current term, subject to the terms and conditions provided therein. Any subsequent renewal of a full-time faculty contract issued before January 11, 2022, shall be in accordance with terms provided herein. For full-time faculty contracts issued after

Dallas College
057501

EMPLOYMENT PRACTICES                                          DCA
TERM CONTRACTS                                            (LOCAL)

January 11, 2022, the contract term shall be prescribed in accordance with this policy and related administrative procedures.

**Voluntary Reduction of Load**

Full-time faculty members may request, in writing, a reduced load during the term of their contract. When a faculty member makes such a request and is granted a reduced load, the faculty member shall have a proportionate reduction in compensation and shall continue to serve at such reduced contract level for the remainder of the term of the faculty member's contract.

Once approved, a request for a reduction of load may not be withdrawn by the faculty member. Accordingly, the contractual workload may not thereafter be increased, except as necessary to meet extenuating circumstances for the benefit of the College District or as required by law. Any increase in contractual workload after a reduction shall be approved in writing by the Chancellor or a designee. The Chancellor shall promulgate procedures for the submission and evaluation of requests for reduced load.

Requests for modifications or reductions to faculty load that may otherwise be authorized by law or College District policy shall be considered and/or provided in accordance with same.

Nothing contained herein shall prohibit the College District from effecting a reduction of load or issuing a notice of nonrenewal for a multi-year contract issued to a faculty member if it is determined, at the sole discretion of the Chancellor or a designee, to be in the best interest of the College District.

# Exhibit G

# The Dallas College Rolling 3-year Policy

Dallas College Board Policy DCA (LOCAL) contains language which provides "At any time after the completion of the first year of a three-year contract, if a faculty member has an "effective" performance rating, he or she may be offered a successor three-year contract at the discretion of the Board."



This language has been in Policy for as long as our archival records exist (since *1987*) and anecdotally has been said to have existed since *1965*.



The concept of a rolling contract constitutes "quasi tenure"; creates a situation in which a vested property right in the contract term is ***virtually perpetual***; and requires termination of the contract only through a ***due process hearing***.

Education Workforce Committee

# Exhibit H

DALLAS COUNTY, TEXAS
FILED Feb 03, 2023, 2:24 pm
BY DEPUTY:
Rasheeda Horn



This Open Meeting of the Board of Trustees is authorized in accordance with the Texas Government Code, §§551.001 through 551.146. Verification of Notice of Meeting and Agenda are on file in the Office of Board Relations. Per Texas Government Code §551.1282, this meeting is being broadcast over the Internet in the manner prescribed by Texas Government Code, §551.128.  In accordance with Texas Government Code §551.127 one or more members of the Board of Trustees may participate in the meeting via videoconference in accordance with the provisions thereof.

## NOTICE OF REGULAR MEETING OF THE BOARD OF TRUSTEES FOR DALLAS COLLEGE AND RICHLAND COLLEGIATE HIGH SCHOOL
## Thursday, February 9, 2023 | 4:00 PM

**Administrative Office**
**1601 Botham Jean Blvd., Room #007**
**Dallas, Texas 75215**
**http://www.dallascollege.edu/boardmeetingslive**

*Persons who address the Board are reminded that the Board may not take formal action on matters that are not part of the meeting agenda and may not discuss or deliberate on any topic that is not specifically named in the agenda. For any non-agenda topic introduced during this meeting, there are three (3) permissible responses: 1) to provide a factual answer to a question; 2) to cite specific Board Policy relevant to a topic; or 3) the topic may, at a later date, be placed on a Board Agenda for a subsequent meeting.*

*Speakers shall direct their presentations to the Board Chair, or the Board, as a whole.*

## Regular Meeting Agenda

1. **Roll Call - Announcement of Quorum**

2. **Certification of Notice Posted for the Meeting**

3. **Pledges of Allegiance to U.S. and Texas Flags**

DALLAS COUNTY, TEXAS
FILED Dec 07, 2023, 2:24 pm
BY DEPUTY:
Rasheeda Horn

**4.    Citizens Desiring to Address the Board**

**5.    Special Presentation: Texas Association of Community Colleges (TACC) Community College Day in Austin**

Presenter: Debbi Richards

**6.    Chancellor and Board Announcements**

*(Comments on Accomplishments; Awards Received; Appointments at the Local, State, and National Level; Published Articles and Newspaper Reports; District/College Reports/Metrics, and Upcoming Events; Workshops, Seminars, and Conferences taking place at the District or any of its Colleges)*

6.1.    Announcements from the Chancellor

6.2.    Announcements from the Board Chair and/or Trustees

**7.    Opportunity for Members of the Board and Chancellor to Declare Conflicts of Interest Specific to this Agenda**

**8.    Consent Agenda**

*(Consent Agenda items may be approved by a single motion and vote or, alternatively, upon request of a Trustee(s); any listed item can be removed and considered individually.)*

8.1.    Meeting Minutes

a. Meeting Minutes for December 6, 2022 Regular Meeting

b. Meeting Minutes for January 24, 2023 Work Session

8.2.    Finance Items

a. Approval of Graduation Alliance Initiative including Student Success Re-Engagement of At-Risk students

8.3.    Policy Items

a. Policies Concerning Development of Policy and Administrative Rules and Regulations: BE & BH (LOCAL)

b. Approval of Amendment to Policies Concerning Personnel – DD, DCA, DLA & DMAA (LOCAL)

c. Policies Concerning College Transfer: FBA (LOCAL)

FILED: Feb 02, 2023, 2:24 pm

BY DEPUTY:
Rasheeda Horn

8.4.    Resolutions

a. Adoption of Resolution Authorizing Agreement for the Receipt of Funds for the Dallas College Autonomous Initiative

## 9.    Individual Items

9.1.    Talent Items

a. Approval of Warrants of Appointment for Police Officers

## 10.    Informative Reports

10.1.    Committee Reports
*(Committee notes are listed only after they have been reviewed and approved by the committee in question.)*

a. Governance Committee Notes for November 1, 2022

b. Finance Committee Notes for November 1, 2022

c. Education Workforce Committee Notes for December 6, 2022

10.2.    Richland Collegiate High School Board Outcome Goal

10.3.    Richland Collegiate High School Financial Integrity Rating System of Texas Financial Management Report

10.4.    2019 Dallas College Bond Program Monthly Status Report (December 2022)

10.5.    1st Quarter Investment Transactions

10.6.    1st Quarter Facilities Improvement Plan

10.7.    1st Quarter Budget Book Vendor Summary

10.8.    Current Funds Operating Budget Report (December 2022)

10.9.    Dallas College Foundation Report (December 2022)

10.10.    Notice of Grant Awards (February 2023)

10.11.    Monthly Change Order Summary (November 2022)

10.12.    Monthly Change Order Summary (December 2022)

FILED: Feb 03, 2023, 2:24 pm

BY DEPUTY:
Rasheeda Horn



10.13. Workforce & Advancement Ascend Institute Report (November 2022)

10.14. Workforce & Advancement Ascend Institute Report (December 2022)

10.15. Dallas College Human Capital New Hire/Position Report (November 12, 2022 - January 12, 2023)

## 11. Executive Session (if required)

11.1. Consultation with Attorney Regarding Legal Matters or Pending and/or Contemplated Litigation or Settlement Offers - Section 551.071

11.2. Personnel Matters Relating to Appointment, Employment, Evaluation, Assignments, Duties, Discipline, or Dismissal of Officers or Employees - Section 551.074

11.3. Deliberate Regarding Real Property Since Open Deliberation would have a Detrimental Effect Upon Negotiations with a Third Person - Section 551.072

11.4. Deliberate Regarding Security Devices or Security Audits - Sections 551.076 and 551.089

## 12. Adjournment

---

*CERTIFICATION OF NOTICE POSTED FOR THE FEBRUARY 9, REGULAR MEETING OF DALLAS COLLEGE AND RICHLAND COLLEGIATE HIGH SCHOOL BOARD OF TRUSTEES*

I, Justin H. Lonon, Secretary of the Board of Trustees of Dallas College, do certify that a copy of the notice for this meeting was posted on the 3rd day of February 2023 in compliance with the applicable provisions of the Texas Open Meetings Act.

_____
Justin H. Lonon, Secretary

POLICY ITEM NO. 8.3.b.

> Approval of Amendment to Policies Concerning Personnel – DD,
> DCA, DLA & DMAA (LOCAL)

In January 2022, as part of the removal of the automatic three-year contract for faculty, the Board approved amendments to local policies DCA & DMAB, relating to the provision of administrator and faculty contracts and the procedural protections that govern notice of non-renewal of same. As Dallas College works to finalize the Evaluation System on which recommendations for renewal and the award of multi-year contracts will be based, revisions to related policies are necessary to ensure they align with the January 2022 amendments to DCA & DMAB, College District practice, and applicable laws.

To achieve that end, the Chancellor recommends the Board amend the following local policies:

EFFECTIVE DATE: UPON BOARD APPROVAL

| LOCAL POLICY | EXPLANATORY NOTES |
|---|---|
| DD – Personnel Positions | Revisions to policy would remove definitions, "Effective," or a portion of a definition, "Faculty," that are no longer applicable to College District practices due to changes to pending changes to the College District Evaluation System or the 2020 reorganization. |
| DCA – Term Contracts | Revisions to policy would clarify that performance will be evaluated in accordance with the College's District's evaluation policy and any procedures promulgated thereunder. Revisions would also add language to clarify the meaning of a "Voluntary Reduction of Load." |
| DLA – Employee Evaluation | Revisions to policy would provide for the evaluation of all full-time employees of the College District – staff, faculty, and administrators – in accordance with procedures and criteria promulgated by the Chancellor. |
| DMAA – Termination Mid Contract | Revisions to policy would clarify that the procedural protections set forth in DMAA (LOCAL) apply only to terminations effected in the middle of a contract term. Non-renewal of a contract and notice of same are governed by DMAB (LOCAL) |

 Existing Policy    Deleted Policy     New Policy     GC Edits

PERSONNEL POSITIONS                                                    DD
                                                                  (LOCAL)

***

**Definitions**          The following terms shall have the meanings herein respectively
                         ascribed to them within policies on personnel in this manual:

1.   Academic Year: The period of College District operations ap-
     proved by the Chancellor, normally including a fall and spring
     semester.

2.   Adjunct Instructor: A person employed as a part-time faculty
     member.

3.   Administrator: Any person who has significant administrative
     duties relating to the operation of the College District, includ-
     ing, but not limited to, the operation of a department, college,
     program, subdivision, or operating unit of the College District;
     accountability for budgets and expenditures in assigned ar-
     eas; or the direct supervision of staff to produce desired re-
     sults.

4.   College Year: The period of College District operations com-
     mencing on or about September 1 and including the immedi-
     ately following fall and spring semesters and summer ses-
     sions.

5.   Contractual: As to personnel, those persons having a formal
     employment contract with the College District that prescribes
     a fixed term, compensation, and duties. All administrators and
     faculty are contractual personnel.

6.   Effective: As to faculty evaluation, a performance rating of
     "Meets Standards of Performance" or "Exceeds Standards of
     Performance."

7.6.   Faculty: Persons employed generally on an academic year
     basis and (9 months) persons employed up to 11 months and
     who are engaged in the delivery of academic programs. Fac-
     ulty shall include instructors, counselors, resource consult-
     ants, and librarians, either full-time or part-time. A faculty
     member who is serving under a three-year contract of em-
     ployment may use the title of professor.

***

\*\*\*

**Administrative Personnel**

Administrative contracts shall be issued in accordance with applicable laws and College District policies and administrative procedures, as promulgated by the Chancellor.

An administrator who, in the opinion of the Chancellor, has significant administrative duties such that it would be in the best interest of the College District to enter into a contract of employment for a term longer than one year, and who has rendered high-quality services to the College District as determined ~~in accordance with the College District's evaluation policy, and any procedures promulgated thereunder~~ ~~by the most recent employee evaluation obtained through the College Performance Evaluation System~~, may be offered a multi-year contract, for a term of up to three years, in accordance with College District procedures. Persons eligible for such a contract shall be members of the Chancellor's leadership team. [See BG(REGULATION)]

\*\*\*

Full-Time Faculty

Full-time faculty contracts shall be issued in accordance with applicable laws and College District policies and administrative procedures, as promulgated by the Chancellor.

A faculty member who has rendered high-quality services to the College District, as determined ~~by the~~ in accordance with the College District's evaluation policy, and any procedures promulgated thereunder ~~faculty member's most recent faculty evaluation obtained through the College Performance Evaluation System~~, may be offered a multi-year contract, for a term of up to three years, in accordance with College District procedures. Nothing contained herein shall prohibit a recommendation of a contract term of less than three years for any such faculty member.

\*\*\*

~~Wind-Down (Voluntary)~~Voluntary Reduction of Load

F~~ull-time~~ faculty ~~members serving a multi-year contract~~ may request, in writing, a reduced load during the term of their contract. When a faculty member makes such a request and is granted a reduced load, ~~no additional multi-year contract will be offered. Upon approval of a request for a reduced load,~~ the faculty member shall ~~be placed in "wind-down" contractual status, with~~have a proportionate reduction in compensation, and shall continue to serve at such reduced contract level for the remainder of the term of ~~his or her~~ their employment contract. ~~For purposes of this provision, "wind-down contractual status" refers to effective nonrenewal of a multi-year contract.~~

EMPLOYMENT PRACTICES                                              DCA
TERM CONTRACTS                                                (LOCAL)

Once approved, a request for a reduction of load reduced contract request may not be withdrawn by the faculty member. Accordingly, the contractual workload may not thereafter be increased, except as necessary to meet extenuating circumstances for the benefit of the College District or as required by law. Any increase in contractual workload after a reduction shall be approved in writing by the Chancellor or a designee. The Chancellor shall promulgate procedures for the submission and evaluation of requests for reduced load.

Requests for modifications or reductions to faculty load that may otherwise be authorized by law or College District policy shall be considered and/or provided in accordance with same.

Nothing contained herein shall prohibit the College District from effecting a reduction of load or issuing a notice of nonrenewal for a multi-year contract issued to any contractual employee a faculty member if it is determined, at the sole discretion of the Chancellor or a designee, to be in the best interest of the College District.

EMPLOYEE PERFORMANCE                                                DLA
EVALUATION                                                      (LOCAL)

**a~~Contractual~~ Employees**

The ~~College District and the administration shall be responsible for developing and maintaining, with input from professional staff.~~Chancellor shall promulgate procedures and criteria for the evaluation of all ~~contractual~~ full-time employees, including administrators, faculty~~employees~~ and staff. These procedures and criteria shall be the basis for recommended reclassification on the salary schedule, promotions, salary increases, ~~and~~ multi-year contracts, and other benefits, as may be provided by College District ~~.~~policy.

~~The immediate supervisor of an instructor will, at regular intervals, visit classes and hold conferences with each first-year instructor under his or her supervision to assist in improving teaching. All instructors will be visited frequently enough to provide an accurate evaluation of their progress. An objective evaluation of teaching effectiveness will be carried out periodically with each instructor. Written reports of faculty evaluations and conferences shall be prepared by the supervisor.~~ Designated administrative personnel will become sufficiently familiar with the ~~progress of instructors to be~~evaluation procedures and criteria to be in a position to ~~make~~ conduct an accurate ~~written evaluations for the purpose of recommending retention or release~~assessment of an employee's performance. ~~.~~

**~~Staff~~**

~~Written evaluations shall be completed on all professional support staff employees in accordance with procedures established by the Chancellor.~~

***

TERM CONTRACTS                                                              DMAA
TERMINATION MID-CONTRACT                                                  (LOCAL)

\*\*\*

**Due Process**
**Procedures**

Due process procedures for faculty members for terminations dur-
ing a contract term ~~or for nonrenewal of faculty members on three-~~
~~year contracts~~ are as follows.

\*\*\*

The hearing shall be conducted by the hearing officer in the man-
ner that ~~he or she~~ the _hearing officer_ deems most appropriate,
within the guidelines specified herein including the provisions that:

1.  The faculty member and the ~~college president~~Provost shall
    have the right to be represented by counsel if they choose.

2.  The faculty member shall have the right to face and to ques-
    tion those persons on whose judgments and opinions the rec-
    ommendation ~~against reemployment~~for termination is based.

3.  The faculty member and the college president shall have the
    right to present facts and to bring forward witnesses.

4.  Witnesses shall be placed under oath by the hearing officer.

5.  The burden of proof shall be upon the college president to
    show facts, by a preponderance of the evidence, that support
    the termination ~~or nonrenewal~~.

Records and
Findings

\*\*\*

Following the conclusion of the hearing, the hearing officer shall,
within seven days, deliver a finding of fact in writing to the ~~college~~
~~president~~Provost, to the faculty member, and to the Chancellor. In
addition to the findings of fact, the hearing officer shall include a
conclusion based on the facts that the reasons supporting the con-
templated termination ~~or nonrenewal~~ have or have not been sus-
tained.

\*\*\*